# Illinois Official Reports

## Appellate Court

***Foster v. Statham*, 2020 IL App (5th) 190103**

| | |
|---|---|
| Appellate Court Caption | PEGGY FOSTER, Petitioner-Appellee, v. NORMAN A. STATHAM, Respondent-Appellant. |
| District & No. | Fifth District<br>No. 5-19-0103 |
| Rule 23 order filed<br>Motion to<br>publish granted<br>Opinion filed | December 30, 2019<br><br>January 14, 2020<br>January 14, 2020 |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 18-OP-952; the Hon. Tameeka L. Purchase, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Curtis W. Martin, of Shaw & Martin, P.C., of Mt. Vernon, for appellant.<br><br>Curtis L. Blood, of Collinsville, for appellee. |
| Panel | JUSTICE MOORE delivered the judgment of the court, with opinion.<br>Justices Cates and Boie concurred in the judgment and opinion. |

## I. BACKGROUND

¶ 2 The respondent, Norman Statham, appeals from the February 13, 2019, order of the circuit court of St. Clair County that granted a plenary order of protection in favor of the petitioner Peggy Foster. For the following reasons, we affirm.

¶ 3 On December 4, 2018, Foster filed an emergency order of protection in the circuit court of St. Clair County against Statham. The circuit court granted the emergency order of protection on that same day. On February 13, 2019, a plenary hearing was held before the trial court with both parties present with their respective counsel.

¶ 4 At the plenary hearing, Foster testified that she and Statham had dated, on and off, for a period of 10 years from 2008 until October 2018. When asked how she characterized her relationship with Statham, she described it as "[v]ery verbally abusive. Not good at all." She also testified that physical abuse had occurred in the past. She testified that on three different occasions she had to move or leave the home she was living in due to altercations or abuse involving Statham.

¶ 5 She testified that in August 2015, a physical altercation ensued after Statham called her a racial slur. She stated that he then

> "[t]hrew me down on the floor and choked me and bit me, and bruised my arm. He broke like my elbow bone and put a bruise on my hand. Bit my finger. Pulled my hair. And he threw me down, choked me, and put the dish rag on me ***."

Law enforcement responded to the altercation and arrested Statham. According to Foster's testimony,[1] Statham was charged with "a domestic" and was held in custody for three weeks until the charges were dropped due to her noncooperation with the prosecution.

¶ 6 Foster next testified about an altercation between her and Statham that occurred on October 22, 2018. On that date, she and Statham got into a verbal altercation that involved Statham slamming a door and approaching her in a threatening manner. Before Statham reached her, though, he stopped and exited her home, outside to his vehicle. While still in Foster's driveway, Statham sat in his vehicle and texted Foster. She stated that she did not know the contents of those particular texts on that day because she blocked his calls and text messages on her phone. She testified that she blocked his text messages because in the past he had sent her texts which contained mean and demeaning comments and racial slurs. He had also recently accused her of being romantically involved with a coworker. She testified that this encounter made her fearful for her safety.

¶ 7 After the October 2018 altercation, Statham began "coming by the house and kept driving by." Specifically, on November 22, 2018, Thanksgiving Day, Statham monitored the home she was at for the Thanksgiving holiday. "He was down like at the end of the street with his lights turned off, then he drove by the house real slow." She was able to identify it was Statham because he was driving his van, which was blue with no back windows. Not only did she see

---

[1]This specific testimony was not directly disputed by Statham; however, he did dispute ever striking Foster or threatening to hit her on any other occasion, and he also disputed whose actions instigated the August 2015 altercation.

him on that day, but others had witnessed him in the act of surveilling her. She claimed that her neighbor/landlord had seen the van, as well as her granddaughter and grandson.

¶ 8    Foster testified that she ultimately decided to obtain an emergency order of protection after Statham cut her vehicle's tires. She admitted that she did not witness him cut her tires but testified that "I have no problem with anyone" and "this is something that he would do *** things don't go his way, he's going to get you back."

¶ 9    In addition to the above, Foster testified that she discovered that Statham had placed a listening device in her home and had monitored her private conversations for over a month in order to determine if she was romantically involved with another person. She became suspicious of his spying because he would bring up topics she had spoken about in private. She then discovered notes he had been keeping of the recorded conversations, as well as a recorder user guide. Statham admitted while testifying to placing the recording device and monitoring her conversations. Further, Foster testified she received a multipage letter from Statham that contained an incoherent writing, which she believed was intended to hurt her feelings and degrade her.

¶ 10   Following service of the emergency order of protection on Statham in early December 2018, Foster received a suspicious unmarked envelope in her mail. This resulted in the delivering postal worker and postal officials examining the card to make sure it was safe for opening, as she "was afraid" because she "didn't know what was in the envelope" and "I didn't know what to expect from [Statham]." Eventually, it was discovered that the envelope contained a Christmas card with a note and cash inside. The card was unsigned but used the pet nicknames that Foster and Statham used with one another. She believed that Statham sent her the card.

¶ 11   Statham also testified at the hearing. He admitted that a physical altercation occurred in August of 2015 but testified that he was only reacting to the actions of Foster. He testified that in the past he had been abused by her. Specifically, he testified that she had poured hot grease on him, pulled a knife on him, thrown a radio at him, and bitten and scratched him.

¶ 12   Regarding the October 2018 altercation, Statham admitted that, after Foster's son had left her home earlier that day, he mocked him and was laughing at him in front of Foster. He stated this angered Foster, who then pulled a kitchen knife and told him he had to leave her home. He then left without coming towards her or threatening her. He admitted to sitting in his van and texting her a few times but disputed that he was sitting in the van outside of her home for a long period of time. Additionally, he denied slashing her tires, surveilling her home, or sending her the Christmas card. Other than the August 2015 incident for which he was arrested, he denied ever striking or threatening Foster.

¶ 13   Statham did admit to placing a recording device in Foster's home and admitted to writing notes documenting the private conversations that were recorded. He testified that he sent Foster a letter in November after she refused to reply to his text messages. Then after her failure to respond to the November 2018 letter, he attempted to speak to her at her place of work, where she promptly left and refused to speak with him. He denied ever returning to her place of work after that encounter.

¶ 14   Following the testimony presented at the plenary hearing, the circuit court found in favor of Foster and entered a plenary order of protection against Statham, finding that "the behavior exhibited by Mr. Statham does rise to the level of abuse" and that the abuse which has occurred included "physical abuse as well as harassment by [Statham]." The trial court specifically

considered the "the nature, severity, frequency, pattern and consequences of this and past abuse, the likelihood of danger of future abuse" and found that "Norman Statham, unless prohibited, would likely cause irreparable harm or continued abuse to [Foster]." The order required Statham "to stay 500 feet away from Ms. Foster and have no contact with her either directly or through a third party." It additionally required Statham to "stay 500 feet away from her [residence] as well as from her place of employment when she is present." The order of protection is to last for a period of two years from the date of its entry.

¶ 15                                   II. ANALYSIS

¶ 16       This action involves claims of domestic violence and, therefore, falls under the purview of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2018)). In *Best v. Best*, 223 Ill. 2d 342 (2006), the Illinois Supreme Court addressed the proper standard of review for a finding of abuse under the Act. The supreme court noted that, once the trial court has made a determination that the petitioner was in fact abused, an order of protection shall be issued. *Id.* at 348; 750 ILCS 60/214(a) (West 2018). The supreme court further stated that a trial court is to use a preponderance of the evidence standard in making that determination. *Best*, 223 Ill. 2d at 348. However, on appeal, when the trial court's finding is challenged, "[t]he circuit court's finding on whether abuse *** occurred will not be disturbed *** unless contrary to the manifest weight of the evidence." (Internal quotation marks omitted.) *Id.* at 349. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.* at 350. Importantly, "[a] reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.* at 350-51.

¶ 17       On appeal, Statham argues that the trial court erred in entering a plenary order of protection against him based upon the evidence presented at trial. Because the issue raised is whether the trial court's finding of abuse was against the manifest weight of the evidence, we first must consider what constitutes "abuse" under the Act. The Act discusses both "physical abuse" and "harassment" as subcategories of "abuse." 750 ILCS 60/103(1) (West 2018). " 'Physical abuse' includes sexual abuse and means any of the following: (i) knowing or reckless use of physical force, confinement or restraint; (ii) knowing, repeated and unnecessary sleep deprivation; or (iii) knowing or reckless conduct which creates an immediate risk of physical harm." *Id.* § 103(14).

¶ 18       In this case, Foster testified regarding their August 2015 physical altercation that resulted in the arrest of Statham and injuries to Foster. Foster testified that Statham did the following during the altercation:

> "Threw me down on the floor and choked me and bit me, and bruised my arm. He broke like my elbow bone and put a bruise on my hand. Bit my finger. Pulled my hair. And he threw me down, choked me, and put the dish rag on me ***."

¶ 19       The images of her person taken by responding law enforcement following the altercation that day confirm the injuries claimed and were submitted as exhibits before the trial court. The arrest, injuries, and images are not disputed by Statham. Statham's only defense is that Foster escalated the altercation and turned it physical by throwing a radio at him after he called her a racial slur. He argues that he only used reasonable force in defending himself from her attack.

¶ 20    While Statham's testimony paints him as the victim of the events of August 2015, Foster's testimony does otherwise. Further, law enforcement placed Statham under arrest as a result of the incident, and he was held in custody for three weeks before the domestic violence charges were eventually dropped.[2] Despite Statham's claims, there is sufficient evidence to support the trial court's finding that Statham did physically abuse Foster. Thus, we do not believe the court's finding was against the manifest weight of the evidence. Although the August 2015 instance of abuse is sufficient for a trial court, in its discretion, to find that the entry of an order of protection is warranted under the Act, we will briefly address the other instances of abuse raised by Foster.

¶ 21    The second subcategory of abuse under the Act is harassment. "Harassment" is defined as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). Here, Foster testified that during the October 22, 2018, altercation Statham slammed doors in her home, mocked and laughed at her son, came towards her in a threatening manner, and after exiting the home, immediately began texting her while he was still in the driveway. Foster testified that she did not see the texts Statham sent her because she blocked them from her phone. She testified that she blocked the texts because Statham had sent her mean and harassing texts in the past and she did not want to receive them anymore. These actions by Statham, if true, were not necessary to accomplish anything reasonable under the circumstances and would have caused a reasonable person emotional distress. Further, Foster testified that, in fact, the events that day did result in her being fearful.

¶ 22    While some of Foster's testimony was disputed by Statham, the trial court was present during the hearing, observed the testimony of the parties and their demeanor, and concluded that the testimony of Foster was more credible than Statham's testimony, as indicated by its order. It is not this court's place to "substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best*, 223 Ill. 2d at 350-51. Given the evidence presented, the trial court's conclusion that abuse had occurred was not unreasonable or out of line with the evidence presented.

¶ 23    Additionally, Foster testified to numerous other incidents of harassment. She testified that Statham was parked on the street outside of the home in which she celebrated the 2018 Thanksgiving holiday and that he drove by the residence slowly multiple times. She also testified that others had witnessed him surveilling her on other occasions including her landlord and grandchildren. Statham denies these allegations and argues that Foster never explicitly testified that these actions caused her distress and, as a result, she did not prove one of the necessary elements to obtain an order of protection.

¶ 24    In response, we look to the Act, where it lists six types of conduct which are "presumed to cause emotional distress." 750 ILCS 60/103(7) (West 2018). The fourth on that list is "repeatedly keeping petitioner under surveillance by remaining present outside his or her home." *Id.* § 103(7)(iv). Thus, Statham's claim that Foster did not explicitly testify that Statham's surveillance caused her distress is not a barrier to her arguing this conduct constituted abuse under the Act. Therefore, if the trial court found Foster's testimony credible as it stated, then a finding of abuse would not be against the manifest weight of the evidence.

---

[2]Foster testified the reason the charges were dropped was because she refused to testify against Statham after he had repeatedly asked her not to aid in his prosecution. Statham denied this testimony.

¶ 25    Further, there was testimony that Statham sent incoherent or "alarming" letters to Foster, confronted her at her place of work when he did not receive responses to his texts and letters, sent her cards after being served with the emergency order of protection, and planted secret recording devices in Foster's home in order to record and spy on her private conversations.

¶ 26    While Statham denied many of the allegations made against him by Foster, the ultimate question is whether the trial court's finding of abuse in this matter was against the manifest weight of the evidence or, put differently, whether "the opposite conclusion [was] clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350. Given the testimony present in this case, especially when viewed as a whole, the trial court's conclusion that Foster had been abused and that an order of protection was necessary was not against manifest weight of the evidence.

¶ 27                                    III. CONCLUSION

¶ 28    For the foregoing reasons, we affirm the February 13, 2019, order.

¶ 29    Affirmed.